Filed 8/21/25  P. v. Vargas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D086172 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1101633) |
| KEVIN LEE VARGAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Shannon Faherty, Judge.  Affirmed.

Law Office of Zulu Ali & Associates, and Zulu Abdullah Ali, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Junichi P. Semitsu and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Kevin Lee Vargas of the attempted murder of his wife (Pen. Code,[1] §§ 187 subd. (a) and 664), the attempted murder of his mother-in-law (*ibid.*), two counts of torture (§ 206), first degree burglary (§ 459), and resisting an executive officer (§ 69). The trial court sentenced him to a total determinate sentence of 23 years followed by an indeterminate sentence of 28 years to life.

Vargas contends there was insufficient evidence that he had the specific intent to commit the offenses of attempted murder, torture, and burglary because he committed them while he was intoxicated. He also claims that the trial court abused its discretion by admitting three photographs of his wife's injuries, and that defense counsel was ineffective for failing to move for a mistrial after Vargas made an outburst in the presence of the jury.

We disagree with these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prior Encounters Between Vargas and A.G. (Wife)*

Vargas and Wife began dating in 2007 and married in 2009. Wife testified that throughout their dating relationship and in their marriage, Vargas committed many acts of domestic violence against her. Vargas was "[o]verly jealous" and "possessive" of Wife. He would physically injure Wife whenever she failed to follow his "rules." Vargas had given Wife black eyes, pulled her hair, and tried to break her arm. He tried to choke her and stab her. Violent incidents occurred three or four times a week. Vargas told her that if she reported him to the police, either Vargas would "do something" to her, or one of his friends would. Wife never reported Vargas because she was

---

[1]    All further statutory references are to the Penal Code.

afraid that if she did, she "would get hurt worse" than the incident she was reporting.

In March 2009, Vargas and Wife were living in a Victorville hotel. One day Wife was sitting on the bed talking with a neighbor. Wife said something that offended Vargas. He punched Wife in the face. She fell backwards off the bed. When Vargas left the hotel room, Wife locked the door behind him and went to the window to close the blinds. Vargas got a hammer from their car and hurled it through the window of the hotel room. The hammer grazed Wife's hand. A large chunk of glass from the broken window embedded into her wrist. Wife needed staples at the hospital to close the wound. The injury gave Wife a scar several inches long on her right wrist. Wife did not report the incident because she believed Vargas "would physically injure [her] more or have someone else do it if he happened to be incarcerated."

By August of 2009, Vargas and Wife lived in a house in Apple Valley with two roommates. Wife wanted to go job hunting with their roommates. As they went into the garage to get into the car, Vargas said Wife knew she was not supposed to be going outside and needed to get back into the house. According to Wife, Vargas did not like Wife leaving the house because he was afraid she would catch someone's eye, since she was very pretty, and she would leave Vargas. Vargas held the car door open trying to prevent Wife from closing it. In the scuffle he tried to bite off her ring finger. Wife got out of the car and went into the house. As she and Vargas continued to argue, Vargas punched her with a closed fist in her right eye, knocking Wife off her feet. Vargas punched her again and burned her neck with a cigarette he had in the other hand. Wife again went to the hospital to treat her injuries.

On these occasions, Wife did not report Vargas's violence. When interviewed she lied to police officers about what happened. Vargas told Wife

3

to tell law enforcement that she could not remember anything so "nothing bad has to happen" to her "as a result for being a snitch." She obeyed so Vargas would not do "something horrible [to her] again." On dozens of occasions Vargas made statements that Wife perceived as threats on her life.

B. *The Charged Crimes*

In March 2011 Wife and Vargas had twins. Although they remained married, they began living separately. Wife lived at a house with her mother, E.B. (Mother), 15-year-old brother (Brother), and the twins.

Wife had informed Vargas repeatedly that she wanted a divorce, and on a Friday in mid-July she told him that he could no longer come to the house to visit their children. Vargas became enraged when Wife told him he could not come to the house anymore.

A few days later, Vargas came to the house to try to speak with Wife. He knocked on the door and tried to talk to her through the closed door. Wife told him to leave. Vargas tried to take the screens off the windows and kick in the front door. Wife showed him that she was calling the police, and he left.

A neighbor saw Vargas roaming Wife's yard late that evening. He could also hear Vargas and Wife screaming at each other through the closed doors. According to the neighbor, Vargas "appeared to be under some type of influence" as if he was "either drunk or high on something."

A 911 recording reflects that at 12:53 a.m. on July 16, Wife called to report that a man was "pacing back and forth" in front of her house. Wife claimed that she did not know who the man was. The dispatcher said that deputies were on their way. By the time a deputy arrived, Vargas was gone.

4

Vargas returned to the house after the police left. Wife saw him "outside lurking around," but she did not call the police again because Vargas was not trying to get inside.

The neighbor believed Vargas slept outside the house under the tree that night. Hours later, the neighbor saw Vargas trying to open the front door and trying to get into the garage.

At 2:48 p.m., Wife called 911 to report that her husband "tried to take the screen off my window and then he tried to kick my front door in." When asked if he had been drinking or doing any drugs that day, Wife responded that she had no idea. Wife reported that he left when she told him she was calling the police. Deputies again came to the home but were unable to locate Vargas.

Around 7:00 a.m. on the morning of July 17, Vargas came to the house again. Vargas wandered around the outside of the house and then went to a door, whispering through the door that he wanted to talk. Wife said she did not want to be with him, wanted a divorce, and did not want to see him again.

Vargas became very angry. He started to "freak out," in Wife's words, and began "running around the house like crazy." He kicked at all the doors and windows, trying to get in. He was highly agitated and volatile and could be described as "being in a rage." The neighbor saw Vargas that morning and said Vargas appeared heavily intoxicated and was "stumbling all over the place."

As Vargas was running around the house trying to get in, Wife woke up Mother and Brother. She told them to take the twins to the master bathroom and lock the door. Believing Vargas was going to kill her, Wife grabbed a golf

5

club from the garage, called the police, and stood on the bed in the master bedroom.

Wife heard Vargas trying to get into the garage, then heard him "messing around inside the garage." He began banging on the door between the garage and the house. Wife next heard glass shattering as Vargas broke the sliding glass door from the back patio to the house. Brother also heard the sliding glass door shatter and heard his sister shout, "He's in the house."

Vargas came down the hallway and kicked open the locked master bedroom door. Vargas lunged at Wife, who was standing on the bed holding the golf club. Wife swung the club and tried to hit Vargas but missed. Vargas grabbed the club and hit Wife in the head with it, causing the golf club to snap in half. Wife started screaming. She called out, "Mom, I'm bleeding. Help me."

Mother came out of the bathroom. She saw Vargas with a hammer in his left hand and a knife in his right. Mother recognized the knife as a paring knife from the butcher block in their kitchen. Mother was pretty sure Vargas was "high" and could not say if Vargas "was all there mentally."

Mother said to Vargas, "Kevin, why are you doing this? [Wife] loves you." Vargas stabbed Mother in the chest and hit her in the face with the hammer, knocking her across the room. Mother landed on the bed and bounced onto the floor, where she landed on her back between the bed and the twins' crib.

To shield Mother, Wife jumped on top of Mother, with her back to Mother's chest. Vargas got on top of Wife, hit Wife in the head with the hammer and stabbed her in the neck with the knife. As he continued to strike Wife with the hammer in the head and face, Vargas reached under Wife to stab Mother in the arms, legs, and chest with the knife. Mother

6

estimated that Vargas hit Wife in the head with the hammer about 30 times. Mother was stabbed at least 10 times. Blood was everywhere. The twins' crib was full of blood.

Wife tried to fight him off. Each time she kicked him off, Vargas came back and resumed the attack.

Throughout the attack, both women begged Vargas to stop. Mother pleaded with Vargas, "Please don't kill my daughter in front of me." Vargas did not say anything in response to their pleas. He just continued attacking.

At some point Wife managed to grab the hammer, twist it out of his hand, and kick Vargas across the room. He hit the dresser and slid down it but stood back up and started growling at Wife. Then he stopped, stood up, looked at the ceiling as if he were listening to something, and ran out the door.

As Vargas left out the back door of the bedroom, he stopped and looked at Brother, who had fled the bathroom and was holding the twins in the back yard. Vargas made no effort to say anything to Brother or interact with the twins at all before he took off running toward the back gate. Deputies arrived and apprehended Vargas at gunpoint.

Vargas's attack lasted less than five minutes, from the time he got into the bedroom to the time he fled.

Deputies interviewed and photographed Wife at the scene. Wife and Mother were airlifted to the hospital for medical treatment.

Wife and Mother sustained extensive injuries from the attack. One blow from the hammer broke Wife's jaw. Another knocked out Wife's back teeth. A knife wound to Mother's chest missed her heart by half an inch. Mother had 10 other stab wounds to her arms, legs, feet, and hands, as well as bruises to her right cheekbone, eyelid, left forearm, and left thigh. Mother

still bears a mark on her cheek from the hammer blow and scars on her arm and hand.

Wife testified that Vargas was "most certainly" intoxicated that day. Over their years together Vargas was intoxicated "most of the time." Asked if it was alcohol or drugs, she answered it was drugs, explaining, "He likes meth." Wife repeatedly referred to Vargas as "a psycho" during her 911 calls on July 17. But she said Vargas's movements that day were "very calculated and precise," not "wild." Vargas had acted the same way during prior attacks on her. She testified that she did not think Vargas was crazy, but that he "has no regard for anyone but himself" and "he wants his way and he's going to get it. . . ." On the day of the attack, Mother told a deputy that Vargas was "psycho" and "not all there mentally." When asked about his actions, Mother said Vargas was not flailing about, but "acted like he was trying to kill a man. He was swinging hard."

C. *Defense Voluntary Intoxication Theory*

Vargas ultimately proceeded to trial on charges of attempted murder, torture, burglary, and resisting an executive officer.[2] In connection with the specific intent charges, the defense requested that the court instruct the jury on voluntary intoxication. The court agreed and read CALCRIM No. 3426 as part of the jury instructions given. The defense argued voluntary intoxication as a defense in closing argument to the jury.

D. *Verdicts and Special Findings*

The jury convicted Vargas of the attempted murder of Wife, the attempted murder of Mother, two counts of torture, first degree burglary, and

---

[2] This charge stemmed from an incident in October 2013 when Vargas, while in custody, charged at a sheriff's deputy, struck him in the chest with his shoulder, and fought, kicked, and head-butted the deputies who tried to contain him. Vargas does not challenge this conviction on appeal.

resisting an executive officer. The jury found true the allegations that the attempted murder of Wife was "willful, deliberate and premeditated," that he personally inflicted great bodily injury on Wife during domestic abuse, that he personally inflicted great bodily injury on Mother, that he personally used a deadly and dangerous weapon, and that a person was present in the residence during the burglary.

DISCUSSION

I

Vargas first contends there was insufficient evidence that he had the specific intent to commit attempted murder, torture, and burglary because he was intoxicated and under the influence of methamphetamine at the time of the attack. He does not argue that the evidence of the required specific intent was insufficient for any reason other than his intoxication. We therefore focus on his intoxication theory.

A. *Standard of Review*

When a defendant challenges the sufficiency of the evidence supporting a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*People v. Helzer* (2024) 15 Cal.5th 622, 646.) Unless it is clear that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict . . . ," we will not reverse. (*People v. Zaun* (2016) 245 Cal.App.4th 1171, 1174.) Given this deferential standard of review, a " 'defendant bears an enormous

9

burden in claiming there is insufficient' evidence to support a conviction." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020.)

> B. *Substantial Evidence Supports the Jury's Rejection of Vargas's Voluntary Intoxication Theory*

Evidence of voluntary intoxication is admissible on the issue of whether the defendant formed specific intent. (§ 29.4, subd. (b).) To negate specific intent to commit the charged crime, the evidence must show *both* that the defendant was voluntarily intoxicated and that the intoxication " 'affected [the defendant's] 'actual formation of specific intent.' [Citation.]' " (*People v. Serrano* (2022) 77 Cal.App.5th 902, 918.)

By itself, evidence that a defendant was voluntarily intoxicated does not necessarily negate the defendant's specific intent to commit a charged crime. For example, where the jury heard that a defendant was "probably spaced out," "doped up" and "smokin' pretty tough" around the time he murdered four people, this was insufficient to support the defense of voluntary intoxication because "there was no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent." (*People v. Williams* (1997) 16 Cal.4th 635, 677–678.) Similarly, although a defendant's blood tested positive for methamphetamine and he was potentially experiencing "acute intoxication," this evidence was insufficient to support a defense of voluntary intoxication where there was no indication that the methamphetamine "affected his thought process in any way." (*People v. Morales* (2021) 69 Cal.App.5th 978, 998.)

The court here instructed Vargas's jury on voluntary intoxication as follows:

> "You may consider evidence, if any, of the defendant's
> voluntary intoxication only in a limited way. You may

consider that evidence only in deciding whether the defendant acted with the intent to do the act required.

"A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"In connection with the charge of Attempted Murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent to kill. If the People have not met this burden, you must find the defendant not guilty of Attempted Murder.

"In connection with the charge of Torture, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or any sadistic purpose. If the People have not met this burden, you must find the defendant not guilty of Torture.

"In connection with the charge of Burglary, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to commit a felony. If the People have not met this burden, you must find the defendant not guilty of Burglary.

"You may not consider evidence of voluntary intoxication for any other purpose."

There was substantial evidence to support the jury's finding that Vargas's state of intoxication, if any, did not preclude him from developing the specific intent required for attempted murder, torture, or burglary. We first note that the jury received no direct evidence that Vargas was too intoxicated to form the necessary specific intent. No blood test results were presented showing the level of drugs or alcohol in Vargas's system

11

immediately after the attack. And no expert testified regarding Vargas's likely or actual level of intoxication, or how such intoxication could affect an individual's thought process.

Instead, the jury had to infer from Vargas's actions and the testimony of lay witnesses whether he was too intoxicated to form the necessary specific intent. Although the jury could reasonably have found that Vargas was under the influence, there was ample evidence for the jury to conclude beyond a reasonable doubt that he was not so impaired as to prevent him from forming the necessary intent.

Before July 2011, Vargas had threatened to kill Wife "dozens" of times. In the days leading up to the attack, Vargas methodically tried to gain entry at the doors, window, and garage of the house to confront Wife, despite her repeatedly saying that she did not want to speak with him. Vargas had sufficient presence of mind to depart before law enforcement arrived on two occasions, but stayed near enough to return and "lurk[ ] around" the house late one night after the deputies left. These facts suggest a sustained and persistent course of conduct undertaken over several days with subjective awareness of the need to avoid law enforcement.

Vargas's conduct immediately before the attack further supports a reasonable inference that he was capable of formulating the required specific intent for the crimes. On the morning of the attack, Vargas circled the house, trying one entrance after another. He got into the garage, banged on the interior door inside the garage, then went to the backyard where he broke through the glass patio door. During his hunt for a way in, he found a hammer, and once inside the house Vargas selected a knife from a butcher block in the kitchen on his way to the master bedroom. He grabbed weapons even though he could not know whether anyone in the home would offer

resistance, reasonably suggesting that he already formed the intent to violently attack Wife and was arming himself in preparation for carrying out that plan.  His ability to try different methods of entry and think ahead to arm himself with two different weapons supports the jury's determination that he was not too impaired to form the required specific intent for burglary, attempted murder, and torture.

Vargas's subsequent conduct also supports this finding.  Undeterred by the locked bedroom door, Vargas kicked his way in, dodged Wife's swing of the golf club, disarmed her and hit her in return.  Wife was now bleeding from the head and screaming for help from her mother, but Vargas did not stop his attack.  He did, however, change weapons.  He struck Mother with the hammer and knife.  He then piled on top of Wife and Mother and hammered at Wife as they lay on the floor.  Although Wife blocked his access to Mother, Vargas reached underneath Wife to stab at Mother as they were all wedged together between the bed and the crib.  Wife kicked Vargas off repeatedly, giving him opportunities to stop his attack and turn away.  Vargas nonetheless chose to resume striking the two women.  He landed 30 blows to Wife with the hammer and stabbed Mother with the knife 10 times.  He hit Mother in the face with the hammer, and stabbed Wife in the neck and Mother in the chest near her heart.  The jury could reasonably conclude from this evidence that Vargas had volitional control over his movements, knew what he was doing, targeted the vulnerable head, neck, face, and chest areas of his victims, and acted purposefully to accomplish his specific intent to kill and inflict extreme pain for the purpose of revenge or persuasion.

Finally, Vargas only stopped the attack after he likely heard the approaching police sirens.  As he had successfully done on two occasions before, Vargas left the scene to avoid being caught by the police.  When police

13

ordered him to his knees, Vargas did not act in a rage or unthinking frenzy, but again displayed presence of mind by surrendering to a deputy who was pointing a gun at him. This further supports an inference that Vargas was not so intoxicated that he was unable to formulate the required specific intent.

We conclude that the totality of the evidence supports the jury's determination that Vargas was not too intoxicated to form the specific intent required for the crimes of attempted murder, torture, and burglary. Because the evidence did not compel a verdict in Vargas's favor on his intoxication theory, we cannot second-guess the inferences the jury drew on this factual question. (*People v. Rodriguez* (2021) 71 Cal.App.5th 921, 933–934 [when two or more inferences can reasonably be drawn from the facts, reviewing court is without power to substitute its deductions from those of the jury].)

## II

Vargas next argues that the trial court abused its discretion in admitting three photographs of Wife's injuries taken immediately after the attack.[3]

Vargas argued in limine that the photographs should be excluded under Evidence Code section 352 because they were "gruesome and offensive" and because the prosecution had at least six other less inflammatory photos

---

[3] We have reviewed the three photos Vargas argues should have been excluded. The trial court accurately described them as follows: "Exhibit 1 is [Wife] sitting on the ground holding a cloth to her chin.· Her face and arms are all very bloody. There is a paper towel or napkin or some sort of fabric that is bleeding through sitting on the top of her head. [Exhibit] 2 is a somewhat side view of just her face. [Exhibit] 3 is a close-up of her face. There is an incredible amount of blood. There is no question about that. She is bleeding from her head.· She is bleeding—she has blood caked through her hair.· She has blood all over her face, all over her fingers.· She has at least two cloths mopping up the blood in this case."

documenting Wife's injuries.[4]  After reviewing the photographs, the court denied the motion.  The court acknowledged that the photos depicted "an incredible amount of blood" but concluded, "if the defendant did an act that caused gruesome injuries, the jury gets to see that."

The trial court has broad discretion over the admission of allegedly "gruesome" photographs.  (*People v. Mills* (2010) 48 Cal.4th 158, 191.)  To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect.  (*People v. Scully* (2021) 11 Cal.5th 542, 590 (*Scully*).)

In cases involving alleged harm to victims, the jury is generally entitled to see photos of the victims' injuries to assess whether the evidence supports the People's theory of the case.  (See *People v. Gurule* (2002) 28 Cal.4th 557, 624.)  Here, Vargas was alleged to have committed attempted murder and torture by attacking Wife and Mother with a golf club, hammer and knife.  Photographs of Wife's injuries were directly relevant to prove the elements of those charges and corroborate her testimony.

The jury heard testimony that the attack generated a lot of blood, that Vargas struck Wife's head repeatedly, and that Wife's jaw was broken.  Given the graphic and detailed nature of the testimony of the attack and of the resulting injuries, photographs corroborating such testimony were "not so

---

[4]     The three exhibits Vargas now challenges were not the only photographic evidence shown at trial.  The jury was shown photographs of the injury to Wife's teeth; Mother's injuries ; cuts to Vargas's hand after the attack; and other items such as the knife, hammer, and golf club.  The jury also saw photographs of Wife's bruised eye and the cigarette burns to her neck from the August 11, 2009 assault by Vargas.  Vargas does not contest admission of any other trial exhibits.

gruesome or inflammatory as to have impermissibly swayed the jury."
(*Scully, supra*, 11 Cal.5th at 591.) Although the three photos showed a lot of blood, they did not depict any gaping wounds or particularly gory injuries. Ultimately, as in *Scully*, "they did no more than accurately portray the shocking nature of the crimes." (*Ibid.)*

We conclude that the trial court did not abuse its discretion in determining the photographs were relevant and that any prejudicial effect did not outweigh their probative value.

### III

Vargas contends he received ineffective assistance of counsel because his attorney failed to move for mistrial after Vargas made an outburst in the presence of the jury.[5]

During his counsel's opening statement, Vargas exclaimed, "That's not true. I didn't have a hammer in my hand."[6] He also said something to the effect of, "I want to fire my attorney." Outside the presence of the jury, the judge admonished Vargas not to make outbursts in front of the jury or insult his attorney. The court asked Vargas if he wanted to relieve his attorney. Vargas said he did. The court excused the prosecution and conducted a *Marsden*[7] hearing to determine whether to appoint new counsel.

During the ex parte hearing, counsel explained that the defense theory was that Vargas "flew off the handle and went into a state of rage" when Wife

---

[5] The People also describe a second outburst by Vargas during jury deliberations. Vargas does not raise this incident in his appeal, and we decline to address it.

[6] The record does not contain transcripts of the opening statements.

[7] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

16

unjustifiably prevented him from seeing their children. Counsel asserted that it was the most effective theory given the evidence about the hammer. He said he had conferred with Vargas about the theory. When given a chance to address the court directly, Vargas asked the judge to select a new jury based on what his attorney had said about Vargas having a hammer or declare a mistrial. Finding that a difference in opinion on how to proceed with a case was not a basis for relieving counsel, the court kept Vargas's attorney on the case.[8]

When the jurors returned, the court instructed them to ignore or disregard anything that was said in the courtroom that was "out of turn" and reminded them that opening statements would be followed by testimony. Vargas now argues on appeal that his attorney should have requested a mistrial based on his own outburst.

To demonstrate ineffective assistance of counsel, a defendant must show both that the attorney's performance was deficient and that the error prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) A claim of ineffective assistance will not be accepted on direct appeal unless the appellate record makes clear that the challenged act or omission was a mistake beyond the range of reasonable competence. (*People v. Wilson* (1992) 3 Cal.4th 926, 936.)

A mistrial is granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282). The breach must be "incurable by admonition or instruction." (*People v. Haskett* (1982) 30 Cal.3d 841, 854 (*Haskett*). "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial

---

[8] Vargas does not challenge this *Marsden* ruling on appeal.

17

motions." (*Id*. at p. 854.) As a result, "it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance." (*Ibid*.)

Vargas claims that his attorney should have moved for a mistrial because his outburst prejudiced the jury against him. But a mistrial motion based on Vargas's own outburst would have been futile. " 'As a matter of policy, a defendant is not permitted to profit from his own misconduct.' " (*People v. Bell* (2019) 7 Cal.5th 70, 121 [emphasis removed].) This means that a criminal defendant " ' "should not be permitted to disrupt courtroom proceedings without justification and then urge that same disruption as grounds for a mistrial." ' " (*Id*. at p. 121 [noting that reviewing courts have repeatedly upheld denials of mistrial motions prompted by defendant's own courtroom misbehavior and collecting cases].) Any prejudice to Vargas's jury arose from his own misconduct before them, and a court is not required to reward that behavior by granting a mistrial.

Moreover, a mistrial motion was not likely to have succeeded for another reason—the trial judge had already implicitly rejected one. During the ex parte hearing, Vargas himself suggested that a new jury should be selected or a mistrial declared. The trial court told him there would be no new jury, no doubt believing that a curative instruction would sufficiently address the outburst. On appeal, Vargas fails to explain how the incident deprived him of a fair trial or why the court's curative instruction was inadequate. He simply asserts that the jury "witnessed the defendant's emotional and disruptive behavior." Absent some contrary indication in the record, we presume the jury followed the court's admonition. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.)

Vargas does not argue that a mistrial motion "bore strong potential for success" or offer any proof that defense counsel misunderstood or misapplied the law in declining to make the motion. (*Haskett, supra*, 30 Cal.3d at pp. 854–855 [defendant could show incompetence if the attorney's failure to move for mistrial was "grounded in ignorance or misapplication of the law rather than tactical considerations [citations] and if the motion for mistrial bore strong potential for success"].)

Even assuming a mistrial motion would have had any chance of success, Vargas has also failed to demonstrate that his attorney's decision was not a tactical choice. Counsel was proceeding on the best theory available given the evidence. He very well may have chosen not to move for mistrial as he was trying to introduce the defense case to the jury to avoid drawing attention to an outburst by his own client disputing that theory. Or, because the defense theory was that Vargas "flew off the handle and went into a state of rage," counsel may have decided not to object to what Vargas now calls an "emotional and disruptive" outburst. On this record we cannot say there was no rational tactical purpose for the omission by Vargas's attorney. (*People v. Cash* (2002) 28 Cal.4th 703, 734 [" ' " 'record must affirmatively disclose the lack of a rational tactical purpose for challenged act or omission.' [Citation.]" ' "])

Vargas has not met his burden to establish that this is the "rare" case in which an attorney's failure to move for mistrial amounted to ineffective assistance of counsel. (*Haskett, supra*, 30 Cal.3d at p. 854.)

DISPOSITION

The judgment is affirmed.


                                    BUCHANAN, Acting P. J.

WE CONCUR:



KELETY, J.



CASTILLO, J.